[713 NYS2d 9]

IRVING SONNENSCHEIN et al., Appellants-Respondents, v DOUGLAS ELLIMAN-GIBBONS & IVES et al., Respondents-Appellants.

First Department, August 24, 2000

APPEARANCES OF COUNSEL

*Donald A. Hopper* of counsel (*Hopper Law Firm, P. C.,* attorneys), for appellants-respondents.

*Bettina B. Plevan* of counsel (*Robert J. Apfel* and *Amy F. Sandgrund* on the brief; *Proskauer Rose, L. L. P.,* attorneys), for respondents-appellants.

## OPINION OF THE COURT

ROSENBERGER, J. P.

The question presented by this case is whether a real estate broker breaches its fiduciary duty to the seller by showing other sellers' apartments to a prospective purchaser. We conclude that a broker is entitled to show multiple sellers' properties to the same prospective buyer, absent any restriction to the contrary in the agreement between broker and seller.

In the summer of 1990, plaintiffs Irving and Martha Sonnenschein listed their Manhattan condominium apartment for sale with a real estate broker, Phyllis Koch Real Estate (Koch). The original asking price was $975,000. Koch solicited the services of a cooperating broker, defendant Douglas Elliman-Gibbons & Ives (DEGI), to find a buyer. The cooperating broker would receive half of Koch's 5% fee, namely, a 2.5% commission.

In December 1990, Suzanne Turkewitz, a DEGI broker, told the Sonnenscheins that she had a potential buyer, Steve and Jennie Tam. However, the Tams were only willing to pay $820,000. At that time, the Manhattan real estate market was a "buyer's market": real estate prices were falling. Thus, plaintiffs were willing to consider this lower-priced offer.

Turkewitz also wanted a 4% commission, rather than having to share Koch's 5% commission. Accordingly, plaintiffs and DEGI executed a brokerage agreement (drafted by Mr. Sonnenschein, an experienced real estate lawyer) which set forth DEGI's entitlement to a 4% commission in the event that a contract was signed between the Sonnenscheins and "the prospective buyer (Dr. and Mrs. Tam) whom we [DEGI] have brought to the broker with whom you listed this apartment

[Koch]." Though an oral agreement was reached to sell the apartment to the Tams for $820,000, no contract was ever signed.

In the meantime, defendant Patricia Cliff, another DEGI broker, had entered into an agreement with David and Elizabeth Roderick in August 1989, which gave DEGI the exclusive right to sell their apartment. The Rodericks' apartment was located in the Sonnenscheins' building. Plaintiffs acknowledge that the Rodericks' property was superior in some respects; it was slightly larger and had a better view. Cliff showed the Rodericks' apartment to the Tams in December 1990. The asking price was then $995,000. The Tams submitted a bid and on December 27, 1990, the Rodericks agreed to sell for $838,000. The transaction closed shortly thereafter.

Plaintiffs ultimately sold their apartment to another buyer on July 8, 1991, for $790,000. When they learned that they had lost the Tams to a competing seller represented by DEGI, plaintiffs commenced this action against DEGI and Cliff. Plaintiffs alleged that a principal-agent relationship had existed between them and defendants, and that defendants had breached their duty of loyalty to plaintiffs in order to obtain a higher commission on the Roderick sale. Defendants moved for summary judgment to dismiss the complaint on the grounds that they did not owe plaintiffs any fiduciary duty because they were merely cooperating brokers who represented the buyer. Plaintiffs, on the other hand, argued that the 4% commission agreement between DEGI and plaintiffs made DEGI their agent.

The IAS Court denied defendants' motion for summary judgment because it found that DEGI was acting as plaintiffs' agent, and that factual issues existed regarding defendants' knowledge and intent to induce the Tams to buy the Rodericks' apartment rather than the Sonnenscheins'. The court recognized that brokers normally represent multiple sellers who have apartments in the same price range and are therefore competitors in the real estate market. "Nor would this Court hold that a buyer's interest in an apartment would preclude a salesperson from showing that buyer other apartments. Such a situation is, however, markedly different from the instant situation in which an oral agreement on plaintiffs' apartment had been reached." Inducing the buyer to breach that oral agreement would be a breach of fiduciary duty by the broker, the IAS Court concluded.

Before trial, plaintiffs stipulated that their damages would be $52,000, consisting of the $30,000 price differential between

the Tams' offer and the eventual sale price, plus maintenance and mortgage payments. There was no discussion of prejudgment interest. The court denied defendants' motion for a directed verdict at the conclusion of plaintiffs' case. The jury found for plaintiffs on the sole question presented to them, namely whether "defendants knowingly and intentionally acted to sabotage the proposed sale of the Sonnenschein apartment to the Tams."

Defendants' motion to set aside the verdict was denied. The court ruled that, although there was no direct evidence that Cliff was aware of the proposed transaction between plaintiffs and the Tams, a rational jury could have concluded from circumstantial evidence that Cliff learned of the pending sale from Turkewitz and used that information as leverage to expedite the negotiations with the Rodericks.

The clerk thereupon entered judgment for plaintiffs in the amount of $52,000, plus $33,657.53 in preverdict interest. However, the court vacated the award of preverdict interest because the plaintiffs had not provided for it in the stipulation of damages. Plaintiffs now appeal from the denial of preverdict interest, and defendants appeal from the denial of their motion for summary judgment, motion for a directed verdict and motion to set aside the verdict.

Summary judgment should have been granted to defendants. The dissent correctly notes that the IAS Court erred in finding as a matter of law that DEGI acted as plaintiffs' broker. Whether a fiduciary relationship existed between the parties was a question of fact which could have been submitted to the jury. However, the appropriate remedy is to grant defendants' motion for summary judgment, rather than order a new trial, because plaintiffs' theory of liability is flawed. Even assuming, as plaintiffs contend, that they had a fiduciary relationship with DEGI and that DEGI's brokers knowingly derailed the Sonnenschein sale in favor of the Roderick sale, these facts do not support a cause of action for breach of fiduciary duty. It has long been the common-law rule that a real estate broker can represent more than one seller or lessor at a time, and can show multiple properties to the same buyer, without breaching its fiduciary duty (*Anon Realty Assocs. v Simmons Stanley, Ltd.*, NYLJ, June 9, 1993, at 26, col 2; *Coldwell Banker Commercial Group v Camelback Off. Park*, 156 Ariz 226, 751 P2d 542; Annotation, *Right of Real Estate Broker to List Competing Properties of Different Owners*, 71 ALR 699).

The few cases from other jurisdictions that have considered the issue all agree on this point. "It is not to be expected that,

if an intending purchaser is dissatisfied with one piece of property which he has for sale, the broker will decline to show him other pieces of property" (*Lemon v Macklem*, 157 Mich 475, 478, 122 NW 77, 78). *McEvoy v Ginsberg* (345 Mass 733, 189 NE2d 546) held that the broker did not breach his duty of loyalty to the would-be lessor by suggesting to the prospective lessee that it consider leasing a different property which was also represented by the broker. "[I]n the absence of a special restrictive contract, a real estate broker is free to offer the properties of all his principals to a prospective customer" (*id.*, 345 Mass, at 737, 189 NE2d, at 547). Had Mr. Sonnenschein, an experienced real estate attorney, wished to include such a restriction in the commission agreement with DEGI, he could have done so.

Indeed, as the IAS Court recognized in the instant case, the opposite rule would render it impossible for brokers to do business. The fiduciary rules against dual agency, which bar a broker's simultaneous representation of seller and buyer unless both parties consent, cannot be extended to bar simultaneous representation of several sellers who are rivals for the same customer (*Foley v Mathias*, 211 Iowa 160, 162, 233 NW 106, 107). "Otherwise a real estate agent could only have on his list of lands for sale one farm at a time, or would not be allowed to sell his own lands, without first advising one of his patrons of his purpose and interest in other tracts" (*Gaty v Sack*, 19 Mo App 470, 475). We find this reasoning highly persuasive.

In support of its denial of summary judgment, the IAS Court created an exception to this common-law rule: as soon as there is an oral agreement between the first seller (the Sonnenscheins) and the prospective buyer, the broker cannot show the buyer other sellers' properties with the intent to induce the buyer to "breach the oral agreement." No authority was cited for this proposition. As is well known, a contract for the sale of real property is not valid unless it is in writing (General Obligations Law § 5-703 [1]). Where then is the breach? If there was no contract, there can have been no wrongful interference with it (*Herman & Beinin v Greenhaus*, 258 AD2d 260, 261, *lv denied* 1999 NY App Div LEXIS 5217; *Dickstein v Del Labs.*, 145 AD2d 408, 409, *lv denied* 73 NY2d 709).

We would be proposing an unworkable rule if we held that at some point during oral negotiations, the broker becomes precluded from showing other properties to the buyer. Real estate negotiations are often characterized by a series of tenta-

tive oral agreements between the parties. The parties are none-theless free to decide against entering into the sale, until the final terms are reduced to writing. The very purpose of the Statute of Frauds, as applied to real estate sales, is to distinguish these provisional "agreements to agree" from the final, binding contract (*see*, *Fox Co. v Kaufman Org.*, 74 NY2d 136, 140 ["(t)he purpose of Statutes of Frauds is to avoid fraud by preventing the enforcement of contracts that were never in fact made"]). It would be unfair to hold that such an oral agreement imposes greater burdens on the broker than on either of the parties; the buyer would be free to find another seller, but the broker would not be free to suggest any alternative properties on his list.

Accordingly, the judgment of the Supreme Court, New York County (Edward Lehner, J.), entered March 18, 1999, in favor of plaintiffs and against defendants in the principal amount of $52,000, and bringing up for review an order of the same court (Emily Goodman, J.), entered October 23, 1997, denying defendants' motion to dismiss the complaint, and an order of the same court (Edward Lehner, J.), entered September 11, 1998, denying defendants' motion for a directed verdict or to set aside the verdict, should be reversed, on the law, without costs, defendants' motion for summary judgment granted, and the complaint dismissed. The Clerk is directed to enter judgment in favor of defendants dismissing the complaint. Plaintiffs' appeal from the order, same court (Edward Lehner, J.), entered November 20, 1998, granting defendants' motion to vacate the award of preverdict interest, should be dismissed, without costs, as academic, and their appeal from the order of the same court and Justice, entered on or about March 12, 1999, denying their motion deemed to be one to reargue the order of November 20, 1998, should be dismissed, without costs, as nonappealable.

Tom, J. (dissenting). Since a broker " 'cannot act as agent for both seller and purchaser of property in a real estate transaction' " (*Trylon Realty v Roth*, 187 AD2d 715, 716), the central issues in this case are whether the defendant realty company, a co-broker rather than the listing broker, represented plaintiffs, the seller, or the prospective buyers, and thus what fiduciary duties, if any, were owed to any of the parties.

During the summer of 1990, plaintiffs listed their Manhattan condominium apartment for sale with Phyllis Koch Real Estate (Koch) for a discounted 5% commission. Plaintiff Irving

Sonnenschein was a real estate attorney. Testimony indicates that plaintiffs and the listing broker expected that a cooperating broker would receive half (i.e., 2.5%) of the listing broker's commission. However, Koch remained the exclusive broker. The contact agent for Koch was Florence Schulman. Defendant Douglas Elliman-Gibbons & Ives (Douglas Elliman), as a cooperating broker, showed the apartment to Dr. and Mrs. Tam through its agent, Suzanne Turkewitz. Turkewitz, for defendant, informed Schulman, for Koch, that she could produce the Tams as prospective buyers for plaintiffs' apartment. The Tams' offer, communicated by Turkewitz through Schulman to plaintiffs, was for $820,000, down from the asking price of $975,000. Plaintiff Irving Sonnenschein testified that on December 21, 1990, Schulman, for Koch, communicated the offer to him, from Turkewitz, and that Turkewitz then followed up with a call to him. However, Turkewitz indicated that defendant realty company demanded a 4% rather than a mere 2.5% commission. He agreed to the terms. Turkewitz called plaintiff and was assured that the transaction was proceeding.

Also on December 21, plaintiff drafted and faxed to defendant realtor a brokerage agreement, which stated in pertinent part:

"This refers to the prospective buyer (Dr. and Mrs. Tam) whom we [Douglas Elliman] have brought to the broker with whom you listed this apartment [Koch] * * *

"In the event that a contract is signed and exchanged between you [the Sonnenscheins] and our prospective buyer [the Tams], and closing takes place pursuant to such contract, we are to receive at closing 4% of the sale price. If the contract is not signed for any reason whatever, or if the contract is signed but the transaction does not close for any reason whatever (except the Seller's refusal to close notwithstanding that closing should take place pursuant to the contract and that the buyer is ready and able to do so) we [Douglas Elliman] are not to be entitled to any payment of any compensation."

Gina Modiano, as senior vice-president of Douglas Elliman, signed the agreement and faxed it back to plaintiffs the same day. Plaintiffs then prepared three copies of a contract of sale and forwarded them to the Tams' attorney. The attorneys for the Tams informed plaintiffs that the contracts were acceptable and would be signed. However, the contracts were not signed and the transaction was never consummated. The Tams purchased the Roderick apartment in plaintiffs' building for a higher sales price through another agent in defendant realty company.

Defendant Patricia Cliff was a senior vice-president at Douglas Elliman. Pursuant to a written agreement dated August 3, 1989, Cliff had the exclusive listing for the sale of the Rodericks' apartment, which she defined as acting as the exclusive agent for the seller. The Rodericks' apartment was located on the 36th floor of the same building as plaintiffs' apartment (plaintiffs were on the 37th floor). Although the original asking price was $1,395,000, this was reduced thereafter so that by the fall of 1990, the asking price was $995,000. Arlene Wander, an agent with Sulzberger-Rolfe, another realtor, had been representing the Tams during 1990. Sulzberger-Rolfe was acquired by defendant in October 1990, and Wander referred the Tams to Cliff.

Cliff showed the Tams the Roderick apartment around or just before December 15, 1990—about the same time that Turkewitz was showing them plaintiffs' apartment. During the holiday season, the price for the Roderick apartment was negotiated down to $838,300. Cliff recalled the parties came to an agreement at some point between Christmas and New Year's Day. When presented with a computer printout, she verified that the offer was accepted on December 27, 1990. The Tams and Rodericks entered a written contract on December 27, 1990.

Plaintiff's communications in connection with the sale extended over the Christmas holidays. Turkewitz was traveling on vacation during this period of time. Aside from an associate at the firm who could handle details of the sale in Turkewitz's absence, she discussed it with no one else, and particularly not Patricia Cliff, at defendant realty firm. When plaintiff returned to his office after New Year's, though, he was informed by an upset Turkewitz that another agent in defendant's office had sold the Tams another apartment. Turkewitz recalled that around this time, she asked plaintiffs to reduce their price to be competitive with another apartment the Tams were interested in.

Cliff denied knowing of plaintiffs, emphatically denied having been informed by the Tams of their competing offer in the same building, and recalled that, since they spoke mostly in Chinese, she had had little actual conversation with them. She recalled only generally that Wander, representing the Tams, indicated that there was some urgency to the matter, to which Cliff responded while on vacation. However, she was sure that Wander had not mentioned the Tams' bid on plaintiffs' apartment. It is correct that there is neither testimony nor documen-

tation in the record contrary to Cliff's testimony. However, this case was largely built on inference.

Plaintiffs contend that Cliff, having access to the same computer information as would any other employee, and possibly having direct personal knowledge of the deal with plaintiffs in the same building as the Rodericks, and knowing that they had a very motivated buyer, used plaintiffs' deal to leverage the Rodericks into reducing the price. The benefit to defendant Douglas Elliman was a higher commission rate and a higher base price against which that rate would be applied.

Plaintiffs ultimately sold their apartment on July 8, 1991 for $790,000, $30,000 less than the amount agreed upon with the Tams. Plaintiffs commenced this action, alleging that a principal-agent relationship had existed between them and defendant Douglas Elliman concerning the sale of plaintiffs' apartment, and that defendants had breached that fiduciary duty in order to yield a higher commission by inducing the Tams to renege on their agreement with plaintiffs and to purchase the Roderick apartment.

Defendants moved for summary judgment to dismiss the complaint on the ground that they did not owe plaintiffs any fiduciary duty, since they were merely cooperating brokers that represented the buyers and not the seller.

The IAS Court (Emily Goodman, J.) denied defendants' motion and held that Douglas Elliman had acted as plaintiffs' agent, and therefore owed them a fiduciary duty. The court made its finding, in part, on the fact that Douglas Elliman signed a commission agreement with plaintiffs without disclosing that it was acting as the buyers' agent. Nevertheless, the court denied summary judgment to plaintiffs, since there were factual issues concerning Douglas Elliman's knowledge and intent.

Thereafter, a jury trial was conducted before Justice Edward Lehner on the sole question presented: whether "defendants knowingly and intentionally acted to sabotage the proposed sale of the Sonnenshein apartment to the Tams." The jury returned a unanimous verdict in favor of plaintiffs. Defendants' motion to set aside the verdict was denied. Defendants appeal.

Generally, the question whether a fiduciary relationship exists is fact specific to each particular case. Courts consider whether there are written agreements between the parties, and evaluate the parties' ongoing conduct, including whether one party reposed confidence in the other or relied on its

superior expertise or knowledge (*Wiener v Lazard Freres & Co.*, 241 AD2d 114, 122). A real estate broker may be in a fiduciary relationship with its client. If so, the broker has an affirmative duty not to act for another party whose interests are adverse to the principal without the principal's consent, after full disclosure of the relevant facts (*Trylon Realty v Roth, supra*).

In the case at bar, in denying the defendants' pretrial motion for summary judgment, Justice Goodman found that the facts and circumstances of this case established that defendant realty company represented the plaintiff sellers. To make that finding as a matter of law prior to a formal fact finding was, on this record, error. Although the finding is not binding on us, nevertheless, it narrowed the scope of the trial. The issue whether defendant had knowingly and intentionally interfered with the sale was then presented to the jury, which found such conduct. However, a jury first should have reached the question whether the broker owed a fiduciary obligation to plaintiffs before reaching the question whether that obligation was breached. On this basis, I would reverse and remand for trial on all factual issues.

The documentation in this case does not affirmatively dispose of the factual issue of whether defendant acted as agent for the sellers or buyers. Rather, surprisingly for persons experienced in this field (as noted, one plaintiff is a real estate attorney), it is equivocal. But from the absence of written disclosure to the seller that the defendant was representing the buyer, in tandem with other evidence from which the jury could validly draw inferences, discussed below, the jury could have rationally concluded that defendant owed a fiduciary duty to plaintiffs and that defendant breached that duty.

I share the majority's concern that these facts ought not be construed to create a broad principle of law that brokers are precluded from showing multiple properties to multiple parties, conduct which is essentially the life blood of that trade. However, the peculiar facts and circumstances of this case do raise a factual issue more fundamental than some of the concerns expressed by the majority: whether defendant acted as the sellers' (i.e., plaintiffs') broker, or acted for the buyers. The motion court, in denying defendant's motion for summary judgment, went beyond a mere finding that this factual issue precluded summary judgment, and affirmatively found that defendant was the plaintiff sellers' agent. The motion court's finding essentially removed from the jury what should have been a central dispute of fact for jury determination.

The motion court and the majority both find significance in the fact that an oral agreement for the sale of plaintiffs' apartment had not yet been reduced to writing, although they reach different conclusions from that fact. The majority concludes that the Statute of Frauds barred the enforcement of the verbal agreement for sale of the apartment, and that hence there was no contract for the defendant to interfere with. However, insofar as is relevant to the issue whether there was a brokerage agreement making defendant plaintiffs' agent, I am not persuaded that the absence of a written sale contract is significant. There was an agreement, albeit not yet enforceable. In fact, defendant's own conduct, broadly speaking, interfered with the finalization of the sale contract. If the evidence was dispositive that defendant acted as the sellers' agent in that transaction, defendant could hardly claim that its own misconduct in preventing finalization of the real estate contract relieved it of its obligation to deal honestly with plaintiffs. However, again, the flaw in this case is that the premise—that defendant acted as sellers' broker—is not established but for Justice Goodman's finding, and the issue should have been submitted to the jury.

Justice Goodman and the majority herein focus on the December 21, 1990 agreement which memorialized the terms of the fee agreement between the parties but draw different conclusions. The letter agreement is curious in some regards, which helps to explain the ambiguity that is at the root of this case. Although plaintiff is a real estate lawyer, which should factor to some extent into how we evaluate what was understood as between plaintiffs and defendants, nevertheless, defendant, through its senior vice-president, drafted the agreement. We should impose the standard rules of construction regarding contracts containing ambiguities. Moreover, plaintiff Irving Sonnenschein, in his affidavit in opposition to defendant's summary judgment motion, emphatically argued that the mere existence of the brokerage agreement, with him paying defendant directly, converted defendant into his own broker. In the first paragraph, the letter refers to "the prospective buyer (Dr. and Mrs. Tam) *whom we have brought to the broker with whom you listed this apartment*" (italics added). The reasonable implication, if only these words are utilized, is that defendant might have been acting as the buyer's agent. However, the point is never made explicit and certainly no disclosure in any regard is made. In the next paragraph the defendant's

vice-president memorializes that upon closing, it would receive the 4% commission. Hence, as was indicated at trial, the Koch agency would receive 1% of the 5% total commission. No reference is made here or elsewhere to co-brokering, leaving unclear as far as documentation is concerned whether the defendant realty company acted as the seller's broker.

A policy statement by the Real Estate Board of New York, included with the record, indicates that the nature of the agency relationship varies among cases, but that a cooperating broker bringing a buyer to a seller's broker generally acts as the buyer's agent. The same documentation indicates that disclosure of some kind should be provided. The policy statement, though, was issued several years after these events, apparently in response to conflicts arising in multifaceted real estate deals, and, in the final analysis, does not constitute a legally binding statement. Nevertheless, it provides some possible guidance as to what was expected in the trade. Turkewitz has never stated that she was working only on the Tams' behalf, but no clear evidence indicates that she was working directly as plaintiffs' agent. The motion court focused on the existence of a brokerage agreement between plaintiffs and defendant, and the absence of any disclosure therein that Turkewitz was acting as the buyer's agent, to conclude that defendant was the seller's agent on plaintiffs' deal. Moreover, the motion court was persuaded that the existence of the sale agreement, albeit oral, prevented defendant or its agents from inducing one party to that agreement—the Tams—to breach it in a manner that benefitted defendant realty company.

When Justice Lehner submitted the case to the jury, he indicated to counsel that "I will follow what Judge Goodman said the issue is and prepare a verdict on that," that is, whether defendant intentionally sabotaged plaintiffs' agreement with the Tams. However, as noted, the critical flaw in this case is that her finding is not of a type compelled by documentary evidence or uncontradicted sworn statements, and it should have been presented to the jury. Only then would it have been appropriate to address the point upon which the majority focuses.

WILLIAMS and MAZZARELLI, JJ., concur with ROSENBERGER, J. P.; TOM, J., dissents in a separate opinion.

Judgment, Supreme Court, New York County, entered March 18, 1999, reversed, on the law, without costs, defendants' motion for summary judgment granted and the complaint

dismissed. Appeal from orders, Supreme Court, New York County, entered November 20, 1998 and on or about March 12, 1999, dismissed, without costs.