**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 16, 2013**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

1-800 CONTACTS, INC.,

      Plaintiff - Appellant/
      Cross-Appellee,

    v.

LENS.COM, INC., d/b/a Lens.com,

      Defendant - Appellee/
      Cross-Appellant,

and

JUSTLENS.COM;
JUSTLENSES.COM, a Nevada
corporation,

      Defendants.

No. 11-4114, 11-4204, 12-4022

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**
**(D.C. NO. 2:07-CV-00591-CS-DN)**

---

Mark A. Miller, Holland & Hart LLP, Salt Lake City, Utah, (Bryan G. Pratt, Holland & Hart LLP, Salt Lake City, Utah; Marcy G. Glenn, Holland & Hart LLP, Denver, Colorado; and Donald A. Degnan, Holland & Hart LLP, Boulder, Colorado, with him on the briefs), for Plaintiff - Appellant, Cross-Appellee.

Scott R. Ryther, Phillips Ryther & Winchester, Salt Lake City, Utah, (Mark M. Bettilyon, Ray, Quinney & Nebeker, P.C., Salt Lake City, Utah, with him on the briefs), for Defendant - Appellee, Cross-Appellant.

---

Before **BRISCOE**, Chief Judge, **LUCERO**, and **HARTZ**, Circuit Judges.

_____

**HARTZ**, Circuit Judge.

_____

The Lanham Act, 15 U.S.C. §§ 1051–1127, prohibits the infringement of trademarks (used to identify products) and service marks (used to identify services). It was enacted in 1946, but because it speaks in general terms it can be applied to technologies unimagined at the time of enactment. One such technology, the Internet, has created a number of challenging issues. The case before us concerns Internet search engines, which present advertisers with new means of targeting prospective customers and therefore new possibilities for claims under the Lanham Act. The dispute arises out of advertising through AdWords, a program offered by the Internet search engine Google. An advertiser using AdWords pays Google to feature one of its ads onscreen whenever a designated term, known as a keyword, is used in a Google search. We must resolve whether the Lanham Act was violated by an advertiser's use of keywords that resembled a competitor's service mark. For the most part, we hold that there was no violation.

Plaintiff 1-800 Contacts, Inc. (1-800) dominates the retail market for replacement contact lenses. It owns the federally registered service mark 1800CONTACTS. Defendant Lens.com, Inc. is one of 1-800's competitors. To police the use of its mark, 1-800 enters different variations of the mark into

Google searches and monitors what search results are displayed. When 1-800 found that several searches generated paid ads for Lens.com's websites, it concluded that Lens.com had reserved the mark as a keyword. After attempting to resolve the situation informally, 1-800 sued Lens.com for service-mark infringement. Its primary claim was that Lens.com itself had infringed the 1800CONTACTS mark by purchasing keywords resembling the mark. According to 1-800, this conduct had directed potential customers for 1-800 to Lens.com by creating what is known as "initial-interest confusion," which can be actionable under the Lanham Act. As the case progressed, 1-800 supplemented its claim of direct infringement by alleging that certain third-party marketers hired by Lens.com, known as affiliates, had also purchased keywords resembling the mark and that at least one affiliate was using the mark in the text of its online ads. 1-800 sought to hold Lens.com secondarily liable for its affiliates' conduct. The theories of secondary liability, which will be discussed more fully below, were common-law agency and contributory infringement.

The district court awarded summary judgment to Lens.com on all claims. On the direct-liability claim and most of the secondary-liability claims, the court ruled that 1-800 had raised no genuine issue of fact regarding the likelihood of initial-interest confusion. On the remaining secondary-liability claims—which concerned the use of 1-800's mark in the content of ads displayed on Google's

site—the court ruled that 1-800's evidence was insufficient to hold Lens.com liable for any misconduct of its affiliates.

1-800 appeals the summary judgment. To the extent that the court based summary judgment on the ground that no likelihood of confusion existed, we affirm. Traditional analysis and actual marketplace data reveal that the keyword use by Lens.com and its affiliates was highly unlikely to divert consumers. As for the remaining secondary-liability claims, we affirm the denial of liability under agency law because the affiliates, even if agents (or more precisely, subagents) of Lens.com, lacked authority to include 1-800's mark in ads for Lens.com. But we reverse the denial of liability for contributory infringement because the evidence could support a reasonable finding that Lens.com did not take reasonable steps to halt the display of 1-800's marks in affiliate ads once it learned of such display.

Also, we affirm the discovery sanction challenged by Lens.com on cross-appeal (but decline to award 1-800 its attorney fees for defending the sanction in this court), and we affirm the denial of Lens.com's district-court motion for attorney fees.

I.    **BACKGROUND**

A.    **The Dispute**

1-800 is the world's leading retailer of replacement contact lenses. It sells lenses via telephone, by mail order, and over the Internet. In 2003 it registered

with the federal trademark register the nonstylized word mark "1800CONTACTS" as one of its service marks. Aplt. App., Vol. 6 at 1001. The mark achieved incontestable status under 15 U.S.C. § 1065 in 2008. Lens.com is one of 1-800's competitors in the replacement-lens retail market. Unlike 1-800, which advertises through several different media and which derived approximately 40% of its gross sales from sources other than Internet orders in 2007, Lens.com advertises and does business almost exclusively online.

This dispute arose in the summer of 2005, when 1-800 discovered that paid advertisements for Lens.com appeared when one searched for the phrase "1800 CONTACTS" on Google. *Id.*, Vol. 11 at 2654. 1-800 concluded that Lens.com was using the 1800CONTACTS mark in its online marketing. To explain this concern properly, we must first review some mechanics of Internet advertising through search engines. Because 1-800's arguments on appeal focus solely on Lens.com's use of AdWords, a program offered by Google, we describe only AdWords and no other search engines or advertising services.

At the time of the proceedings below, a typical Google search simultaneously yielded two different kinds of results: organic results and sponsored links. Organic results were the links generated by Google's search algorithms, which sorted web pages according to their relevance to the user's search as well as their quality. An advertiser could not pay Google to have its web page displayed among the organic results. Through AdWords, however, an

-5-

advertiser could pay to be displayed as a sponsored link. A sponsored link would include advertising copy and the advertiser's website address. A user who clicked on the ad would be connected to the website. Sponsored links usually appeared either above or to the right of the organic results. The notice "Sponsored Links" was displayed next to each cluster of ads. Google placed background shading behind several of the sponsored links to set them apart visually from the organic results, which appeared on a plain white background.

For its ad to appear as a sponsored link when a user initiated a Google search, an advertiser had to bid to reserve a particular word or phrase—known as a keyword—that would trigger the display of its ad. The advertiser specified whether its ad should appear as the result of (1) a broad match—that is, whenever a Google search contained a phrase that was either similar to or a relevant variation of the keyword; (2) a phrase match—whenever the search contained the exact keyword; or (3) an exact match—whenever the search contained the exact keyword and nothing more. The advertiser could also use negative matching, which instructed Google not to display the ad when a certain search term was used. Negative matching allowed the advertiser to filter out irrelevant searches. For example, if a seller of contact lenses had purchased the keyword *contacts*, it might have wanted to exclude searches for *marketing contacts*.

The display of a sponsored link in response to a user's search was known as an impression. An advertiser paid Google only if the user actually clicked on its

impression; its bid for the keyword represented the amount per click that it was willing to pay. Advertisers who bid higher amounts generally received superior placement among the sponsored links. A click that led to a sale through the advertiser's web page was called a conversion, which did not incur an additional charge to the advertiser from Google.

1-800 apparently reasoned that a Google search for "1800 CONTACTS" could generate an ad for Lens.com only if Lens.com—or someone working on its behalf—had bid on that exact term or on some phrase containing that exact term. In September 2005 it sent Lens.com two letters reporting that online searches for that term were resulting in ads for Lens.com. One of the letters was accompanied by screenshots that showed Google search results for the phrases "1-800 contacts," "1-800-contacts," and "1800contacts." *Id.* at 2657–59. In each screenshot an ad for Lens.com appeared among the sponsored links, along with ads for 1-800 and other retailers. Lens.com responded that it had looked into the matter, had determined who appeared to be responsible, and would advise them not to bid on "1-800-CONTACTS" as a keyword in the future. *Id.* at 2663.

The parties who appeared to be responsible, Lens.com told 1-800, were affiliates. Advertisers like Lens.com might pay third-party affiliates to publish ads for them through AdWords and other search-engine programs. An Internet user who clicked on an ad published by a Lens.com affiliate would be routed directly to one of Lens.com's four websites—www.Lens.com,

www.JustLenses.com, www.1-800GetLens.com, and www.ContactsAmerica.com—or instead would be taken to the affiliate's own website, where links to Lens.com's websites were displayed. When the user made a purchase at one of Lens.com's websites as a result of clicking on the affiliate's ad, the affiliate earned a commission.

Lens.com did not recruit individual affiliates directly; rather, it worked with Commission Junction (CJ), which managed a network of affiliates. Under the arrangement in this case, CJ agreed to pay the commissions to the affiliates for their conversions, and Lens.com agreed to reimburse CJ. According to Lens.com's chief executive officer, Lens.com had four different accounts with CJ in 2009, and through those accounts more than 10,000 affiliates were signed up to promote Lens.com and its brands.

Whatever action Lens.com took in response to 1-800's September 2005 notices, 1-800 continued to express concerns. In November and December 2005 it again contacted Lens.com and advised that Google searches for "1800contacts," "1800 contacts," "1-800-contacts," and "1-800 contacts" were still generating Lens.com's ads. *Id.* at 2695–98. Lens.com replied that it would try to determine who was publishing the ads in question. The next relevant communication did not occur until April 2007, when 1-800's counsel emailed Lens.com's counsel once more to complain that the problem was recurring. Attached to the email were screenshots of search results from Google and another search engine. Lens.com's

counsel replied that he would confer with his client to see whether the problem could be fixed.

1-800 filed a complaint against Lens.com in August 2007 in the United States District Court for the District of Utah. The complaint stated that 1-800 had "discovered that Lens.com had purchased sponsored advertisements from Google, and other search engines, for Plaintiff's Marks to trigger advertising and/or a link to the Lens.com Websites." *Id.*, Vol. 1 at 42. It further alleged that Lens.com had "use[d] the 1800 CONTACTS trademark as a triggering keyword to display and promote Lens.com's directly competitive goods and services." *Id.* at 43. To support this allegation, the complaint included a screenshot of Google search results for the term "1800 CONTACTS" in which an ad for Lens.com was featured. *Id.*

The complaint also alleged that Lens.com had used the 1800CONTACTS mark in its advertising copy, and it included a second screenshot that, unlike any of the screenshots that it had previously disclosed to Lens.com, showed a sponsored link featuring the term "1-800 Contacts" in the ad's text. *Id.* at 44. The Internet address beneath this text was www.JustLenses.com, one of Lens.com's websites.

1-800's chief legal claims were that Lens.com had infringed on its 1800CONTACTS mark under § 32 of the Lanham Act, 15 U.S.C. § 1114(1), which provides a cause of action for the infringement of a federally registered

mark, and § 43(a), 15 U.S.C. § 1125(a), which provides a cause of action for the infringement of unregistered as well as registered marks.

As discovery proceeded, 1-800 learned that Lens.com itself had bid on the following nine terms (the Challenged Keywords) as AdWords keywords: "1-800 contact lenses"; "1800 contact lenses"; "800 contact lenses"; "800comtacts.com"; "800contacta.com"; "800contavts.com"; "800contaxts.com"; "800contzcts.com"; and "800conyacts.com." Aplt. App., Vol. 9 at 1922–23. Lens.com does not dispute that it bid on the Challenged Keywords, nor does 1-800 contend on appeal that Lens.com ever bid on the 1800CONTACTS mark itself. Additionally, 1-800 does not claim that any impressions created by Lens.com featured the 1800CONTACTS mark in their text. Discovery revealed, however, that two Lens.com affiliates, Dusty Goggans and Ryan McCoy, had bid on the keyword "1800Contacts" and close variations of 1-800's mark. *Id.*, Vol. 5 at 507. And McCoy had published at least one ad for www.JustLenses.com (one of Lens.com's websites) that featured the phrase "1800 Contacts" in its advertising copy. *Id.* at 508.

In light of this discovery, 1-800 amended its complaint to convey two theories of how Lens.com had violated §§ 32 and 43(a) of the Lanham Act: (1) that Lens.com had *directly* infringed on the 1800CONTACTS mark by purchasing the Challenged Keywords; and (2) that Lens.com's *affiliates* had infringed on the mark and that Lens.com was secondarily liable for their infringement. It

-10-

advanced two separate grounds for secondary liability. The first—vicarious infringement—imposes liability on a principal for the infringing acts of its agent.[1] The second—contributory infringement—is analogous to aiding and abetting. Before discussing the district court's rulings on 1-800's claims of direct and secondary liability, we briefly review some fundamentals of service-mark infringement under federal law.

**B.    Service-Mark Infringement Under the Lanham Act**

A service mark, similar to a trademark, is defined by the Lanham Act as "any word, name, symbol, or device, or any combination thereof" that is used "to identify and distinguish the services of one person, including a unique service, from the services of others and to indicate the source of the services, even if that source is unknown." 15 U.S.C. § 1127 (2006). 1800CONTACTS is such a mark. The Lanham Act's private causes of action for trademark infringement are available to the owners of service marks. *See Vail Assocs., Inc. v. Vend–Tel–Co., Ltd.*, 516 F.3d 853, 857 & n.1 (10th Cir. 2008); *Donchez v. Coors Brewing Co.*, 392 F.3d 1211, 1215 (10th Cir. 2004). Section 32 of the Act allows the owner of a registered mark to bring an action for infringement against any person who

---

[1] The opening brief of 1-800 makes a passing comment that Lens.com was also in a *partnership* with its affiliates. Insofar as it may be arguing for some form of liability beyond agency law, we do not address the argument because it offers no elaboration and cites no principles of partnership law. *See Utah Lighthouse Ministry v. Found. for Apologetic Info. & Research*, 527 F.3d 1045, 1049 n.1 (10th Cir. 2008). ("Arguments inadequately briefed in the opening brief are waived.").

use[s] in commerce any reproduction, counterfeit, copy, or colorable imitation of [the] registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . .

15 U.S.C. § 1114(1)(a). Similarly, under § 43(a) the owner of any valid mark, registered or not, may sue any person who

uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . .

*Id.* § 1125(a).

The elements of an infringement claim under § 43(a) are (1) that the plaintiff has a protectable interest in the mark; (2) that the defendant has used "an identical or similar mark" in commerce, *Donchez*, 392 F.3d at 1215 (brackets and internal quotation marks omitted); and (3) that the defendant's use is likely to confuse consumers. *See Utah Lighthouse Ministry v. Found. for Apologetic Info. & Research*, 527 F.3d 1045, 1050 (10th Cir. 2008). An infringement claim under § 32 has nearly identical elements, *see Jordache Enters., Inc. v. Hogg Wyld, Ltd*, 828 F.2d 1482, 1484 (10th Cir. 1987), except that the registration of a mark serves as prima facie evidence of both the mark's validity and the registrant's exclusive right to use it in commerce, *see* 15 U.S.C. § 1115(a) (2002). The

-12-

central question in a typical infringement action under either § 32 or § 43(a) is whether the defendant's use of the plaintiff's mark is likely to cause consumer confusion.

Confusion can be of several sorts. For example, consumers may experience direct confusion of source when they develop the mistaken belief that the plaintiff is the origin of the defendant's goods or services—so that the defendant capitalizes on the plaintiff's good name. *See Australian Gold, Inc. v. Hatfield*, 436 F.3d 1228, 1238 (10th Cir. 2006). The classic case of direct confusion occurs when "[c]ustomers want to buy the [plaintiff's] product and because of the similarity of the marks, mistakenly buy the [defendant's] product instead." 4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 23:10 at 23-70 (4th ed. 2013) (4 McCarthy). Or consumers may experience *reverse* confusion of source when they mistakenly believe that the defendant is the origin of the plaintiff's goods or services. *See Australian Gold*, 436 F.3d at 1238. Reverse confusion typically occurs "when the [defendant's] advertising and promotion so swamps the [plaintiff's] reputation in the market" that "customers purchase the [plaintiff's] goods under the mistaken impression that they are getting the goods of the [defendant]." 4 McCarthy § 23:10 at 23-70 to 71. In that circumstance the defendant would not be trying to take a free ride on the plaintiff's reputation but would drown out the value of the plaintiff's mark. This can arise when a national firm adopts a mark that was already being used by a

small business operating in only one locality. *See id.* at 23-71 to 75 (setting forth examples). Confusion need not be limited to the incorrect perception that one party was the source of the other party's product or service; it may also arise from "a mistaken belief in common sponsorship or affiliation." *Amoco Oil Co. v. Rainbow Snow*, 748 F.2d 556, 558 (10th Cir. 1984). Nor must the confusion occur at the point of sale; postsale confusion may propagate among potential consumers who see the relevant product after the original buyer has purchased it. *See Gen. Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1227 (10th Cir. 2007).

The type of confusion alleged by 1-800 is an additional variety—namely, initial-interest confusion, a distinct theory that we recognized in *Australian Gold*. Initial-interest confusion "results when a consumer seeks a particular trademark holder's product and instead is lured to the product of a competitor by the competitor's use of the same or a similar mark." *Australian Gold*, 436 F.3d at 1238. As the name implies, the improper confusion occurs even if the consumer becomes aware of the defendant's actual identity before purchasing the product. *See id.* at 1238–39. In *Australian Gold* the defendants (1) used Australian Gold's trademarks on their own websites; (2) placed Australian Gold's marks in hidden codes associated with their websites (metatags), so that an Internet search for those trademarks would return links to the defendants; and (3) paid a website to list the defendants in a preferred position whenever a user searched for Australian

-14-

Gold's marks. *See id.* at 1233 n.3, 1239. We affirmed the denial of the defendants' motion for judgment as a matter of law because we agreed with the district court that a genuine issue of fact existed regarding the likelihood of initial-interest confusion. *See id.* at 1240.

We have identified six factors (the *King of the Mountain* factors) as relevant to whether a likelihood of confusion exists:

(a) the degree of similarity between the marks;

(b) the intent of the alleged infringer in adopting its mark;

(c) evidence of actual confusion;

(d) the relation in use and the manner of marketing between the goods or services marketed by the competing parties;

(e) the degree of care likely to be exercised by purchasers; and

(f) the strength or weakness of the marks.

*King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1089–90 (10th Cir. 1999). These factors are not exhaustive. *See id.* at 1090. And they should not be applied mechanically; some factors may carry far more weight than others depending on the circumstances. *See id.* ("[T]he weight afforded to some of the factors differs when applied in . . . separate contexts."); *cf. Vail Assocs.*, 516 F.3d at 863–66 (treating actual confusion as the most important factor); *Universal Money Ctrs., Inc. v. AT & T Co.*, 22 F.3d 1527, 1536 (10th Cir. 1994)

(indicating that the lack of actual confusion and the dissimilarity of the marks were the paramount considerations).

A defendant may be held liable for service-mark infringement even though it has not directly infringed on the plaintiff's mark through its own acts. Two theories of secondary liability are pertinent here. First, we have joined the Third Circuit in recognizing that the Lanham Act incorporates common-law agency principles: a principal may be held vicariously liable for the infringing acts of an agent. *See Procter & Gamble Co. v. Haugen*, 317 F.3d 1121, 1127–28 (10th Cir. 2003); *AT & T Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1433–34 (3d Cir. 1994); 4 McCarthy § 25:21.25. Second, in *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 853–54 (1982), the Supreme Court ruled that contributory infringement can violate the Lanham Act. Akin to aiding and abetting, contributory infringement generally consists of either intentionally causing or knowingly facilitating the infringement of the plaintiff's mark by a third party. The *Inwood* Court formulated the theory as follows:

> [L]iability for trademark infringement can extend beyond those who actually mislabel goods with the mark of another. Even if a manufacturer does not directly control others in the chain of distribution, it can be held responsible for their infringing activities under certain circumstances. Thus, if a manufacturer or distributor intentionally induces another to infringe a trademark, or if it continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement, the manufacturer or distributor is contributorially responsible for any harm done as a result of the deceit.

-16-

*Id.* at 853–54 (footnote omitted).

### C.    Proceedings Before the District Court

1-800 moved for partial summary judgment on the issues of direct and secondary liability for service-mark infringement.  Except for the few ads that used the mark in their text, 1-800's only clearly expressed theory of infringement was initial-interest confusion.  Although it asserts on appeal that Lens.com's acts of direct infringement included purchasing merely generic keywords and then failing to designate the 1800CONTACTS mark as a *negative* keyword, that theory was not raised in district court.  Its brief in opposition to summary judgment disclaimed such a position, stating:  "On the Internet, a competitor is free to purchase keywords of the product category (*i.e.*, contact lenses) but the competitor is not free to purchase a competitor's trademark as a keyword."  Aplt. App., Vol. 10 at 2281.  The brief made plain that its direct-infringement claim was limited to the nine Challenged Keywords, and that its principal secondary-infringement claim was limited to the purchase by Goggans and McCoy of keywords that closely resembled its mark.

In an effort to show actual confusion (the third *King of the Mountain* factor), 1-800 offered an example of one confused consumer and the results of a consumer survey conducted by its expert, Carl Degen.  Lens.com moved to strike the survey as unreliable.  It also moved for summary judgment on all claims.  The district court granted Lens.com's motion to strike the survey.  *See id.*, Vol. 3 at

-17-

5456 (Memorandum Decision & Order on Carl Degen Evidence at 1, *1-800 Contacts, Inc. v. Lens.com, Inc.*, Case No. 2:07-cv-591 CW (D. Utah Dec. 15, 2010)) (Survey Order).  And it awarded summary judgment to Lens.com.  *See 1-800 Contacts, Inc. v. Lens.com, Inc.*, 755 F. Supp. 2d 1151, 1191 (D. Utah 2010).

In granting summary judgment the court first ruled that a defendant's purchase of search-engine keywords—in Lens.com's case, the nine Challenged Keywords; and in Goggans and McCoy's case, the term "1800Contacts" and slight variations thereof—can amount to a use in commerce under the Lanham Act.  *See id.* at 1169–70.  But it also ruled that merely purchasing such a keyword cannot, on its own, give rise to liability for infringement.  *See id.* at 1171–74.  Observing that an impression for Lens.com might result just as easily from a Google search for an unprotected, generic term like "contacts" as from a search for the registered mark 1800CONTACTS, the court explained that a Google user confronted with a screenshot of search results would be unable to tell from those results alone which keyword had been purchased.  *See id.* at 1173.  It reasoned that as a matter of law, a defendant's purchase of a search-engine keyword cannot, by itself, create the likelihood of confusion that is necessary for infringement liability; rather, the court ruled that keyword use can generate a likelihood of confusion only in combination with the specific language of the resulting impressions.  *See id.* at 1173–74.  It thus ruled that insofar as the

keyword use of Lens.com and its affiliates generated ads that did not feature 1-800's mark or any variation in their text, no likelihood of confusion existed. *See id.* at 1181–82.

Turning to the few ads (all placed by one affiliate, McCoy) whose text *did* feature some variation of the mark, the district court disposed of 1-800's secondary-liability claims by rejecting its theories of vicarious infringement and contributory infringement. With respect to vicarious infringement it ruled that the evidence did not support a principal-agent relationship between Lens.com and any of its affiliates. *See id.* at 1182–84. And with respect to contributory infringement it ruled that 1-800 had failed to provide any evidence from which a reasonable jury could find that Lens.com either (1) intentionally induced its affiliates to use the 1800CONTACTS mark in the text of their impressions or (2) knew or had reason to know that they were doing so yet failed to take appropriate action. *See id.* at 1185–87.

On appeal 1-800 argues (1) that there were disputed facts regarding likelihood of confusion and (2) that the evidence would support findings of secondary liability under theories of both vicarious liability and contributory infringement. In turn, Lens.com cross-appeals from an order sanctioning it for discovery abuses. And in a separate appeal Lens.com challenges the district court's denial of its motion for attorney fees under both the Lanham Act, *see* 15 U.S.C. § 1117(a) (2008), and Utah law, *see* Utah Code Ann. § 78B–5–825 (2008).

We affirm on all issues but one: contributory infringement. We disagree with the district court's ruling that there was insufficient evidence that Lens.com had the necessary actual or constructive knowledge to be held contributorially liable for the conduct of its affiliates. We also reject Lens.com's unclean-hands defense to 1-800's claims. Therefore, we reverse and remand for further proceedings on the contributory-infringement claim.

## II.   DISCUSSION

We first resolve the issues presented by 1-800's appeal. We then address Lens.com's cross-appeal and its appeal of the denial of attorney fees.

### A.   Direct Liability for Ads Placed by Lens.com

The district court awarded summary judgment to Lens.com on 1-800's claim that Lens.com was directly liable for infringing on its service mark. It ruled that 1-800 had created no genuine factual issue regarding whether Lens.com's keyword use was likely to cause confusion. *See 1-800 Contacts*, 755 F. Supp. 2d at 1181–82. 1-800 asserts that this ruling was error. It argues generally about likelihood of confusion, not distinguishing its § 32 infringement claims from its § 43(a) claims. We, too, need not differentiate between the two provisions, as the tests for likelihood of confusion under § 32 and § 43(a) do not differ materially. *See Jordache*, 828 F.2d at 1484.

We review the district court's grant of summary judgment de novo. *See Sally Beauty Co., Inc. v. Beautyco, Inc.*, 304 F.3d 964, 971 (10th Cir. 2002).

"Summary judgment is appropriate if the pleadings, depositions, other discovery materials, and affidavits demonstrate the absence of a genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Id.* "An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 972 (internal quotation marks omitted). Although the party moving for summary judgment "bears the initial burden of demonstrating an absence of a genuine issue of material fact," it can satisfy that burden with respect to an issue on which it does not bear the burden of persuasion at trial "simply by indicating to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Id.* at 971. Once the moving party has done so, "the burden shifts to the nonmoving party to go beyond the pleadings and set forth specific facts showing that there is a genuine issue for trial." *Id.* As the party alleging service-mark infringement, 1-800 has the burden of proving likelihood of confusion. *See John Allan Co. v. Craig Allen Co. L.L.C.*, 540 F.3d 1133, 1138 (10th Cir. 2008). Likelihood of confusion is ordinarily a question of fact for the jury, but summary judgment is appropriate if no reasonable juror could find that such a likelihood exists. *See Sally Beauty Co.*, 304 F.3d at 972; *cf. King of the Mountain*, 185 F.3d at 1089 ("Courts retain an important authority to monitor the outer limits of substantial similarity within which a jury is permitted to make the factual determination whether there is a likelihood of confusion." (brackets and internal quotation marks omitted)).

-21-

Again, the elements of an infringement claim under the Lanham Act are (1) that the plaintiff has a protectable interest in the mark, (2) that the defendant has used an identical or similar mark in commerce, and (3) that the defendant's use is likely to confuse consumers. That 1-800 has a protectable interest in its mark is not in dispute. And the district court ruled that purchasing the Challenged Keywords satisfied the use-in-commerce requirement, *see 1-800 Contacts*, 755 F. Supp. 2d at 1169–70, a premise that we will assume without deciding. Thus, the only contested issue is likelihood of confusion. 1-800's theory of confusion is initial-interest confusion. Its essential contention is that although Lens.com never published any ads with 1-800's mark in their text, its bidding on the nine Challenged Keywords caused its ads to appear in response to searches for the mark, thereby diverting customer interest away from 1-800's website and toward Lens.com's websites.

The district court ruled that use of the Challenged Keywords, divorced from the text of the resulting ads, could not result in a likelihood of confusion. It pointed out that because Google users view only the results of their searches and cannot tell exactly which keywords an advertiser has purchased, a user who searches for "1-800 Contacts" and then sees an ad published by Lens.com has no way of knowing whether Lens.com has reserved 1-800's mark as a keyword or instead has reserved simply the term *contacts*. *See id.* at 1173. "Given that fact," the court reasoned, "it would be anomalous to hold a competitor liable simply

-22-

because it purchased a trademarked keyword when the advertisement generated by the keyword is the exact same from a consumer's perspective as one generated by a generic keyword." *Id.* at 1174. This argument has some attraction, although if confusion does indeed arise, the advertiser's choice of keyword may make a difference to the infringement analysis even if the consumer cannot discern that choice. *Cf. Holiday Inns, Inc. v. 800 Reservation, Inc.*, 86 F.3d 619, 625–26 (6th Cir. 1996) (defendants did not use plaintiff's mark in commerce when they reserved a common misdialing of the plaintiff's telephone number, thereby merely exploiting preexisting confusion rather than creating it). In any event, we need not resolve the matter because 1-800's direct-infringement claim fails for lack of adequate evidence of initial-interest confusion.

We have already set forth a list of six helpful, nonexhaustive factors for determining likelihood of confusion: (1) similarity of the marks, (2) intent of the alleged infringer, (3) evidence of actual confusion, (4) similarity of the competing parties' services and manner of marketing, (5) degree of consumer care, and (6) strength of the marks. *See King of the Mountain*, 185 F.3d at 1089–90. As we and other courts have emphasized, however, other factors may be considered, and the weight of any given factor can depend very much on context. *See Team Tires Plus, Ltd. v. Tires Plus, Ltd.*, 394 F.3d 831, 833 (10th Cir. 2005) ("As with so many of our multi-factor tests, we have emphasized that this list of factors is not exhaustive, that no single factor is dispositive, and that all factors must be

-23-

considered as an interrelated whole."); *King of the Mountain*, 185 F.3d at 1090 (noting that the similarity of the marks constituted "the heart of our analysis" in a confusion-of-sponsorship case, whereas the parties' manner of marketing and the degree of consumer care had "little importance"); *Nabisco, Inc. v. Warner–Lambert Co.*, 220 F.3d 43, 48 (2d Cir. 2000) (dissimilarity of the marks outweighed all other factors); *Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 153–154 (4th Cir. 2012) (in some contexts "the application of the traditional multi-factor test is difficult because often many of the factors are either unworkable or not suited or helpful as indicators of confusion" (internal quotation marks omitted)); *CareFirst of Md., Inc. v. First Care, P.C.*, 434 F.3d 263, 267–68 (4th Cir. 2006) (ruling that actual confusion was the paramount factor); *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1360 (9th Cir. 1985) (although "certain aspects of the multifactor test describe the circumstances to which a trier of fact would refer in making an educated *guess* as to what was going on in the minds of consumers," in many cases direct evidence may "outweigh whatever circumstantial evidence has been introduced"); *Kellogg Co. v. Pack'em Enters., Inc.*, 951 F.2d 330, 333 (Fed. Cir. 1991) ("We know of no reason why, in a particular case, a single . . . factor may not be dispositive."). The upshot of these cases is that when certain facts are more probative than others on the ultimate issue of likelihood of confusion, those facts may dominate the analysis.

In this case, one item of evidence particularly suggests an absence of initial-interest confusion, the variety of consumer confusion on which 1-800 relies. As we explained in *Australian Gold*, initial-interest confusion occurs when a consumer in search of the plaintiff's product "is *lured* to the product of a competitor." 436 F.3d at 1238 (emphasis added); *see Vail Assocs.*, 516 F.3d at 872 ("Initial interest confusion is a 'bait and switch' tactic that permits a competitor to *lure* consumers away from a service provider by passing off services as those of the provider, notwithstanding that the confusion is dispelled by the time of sale." (emphasis added)). Applying that description to this case, initial-interest confusion would arise as follows: a consumer enters a query for "1-800 Contacts" on Google; sees a screen with an ad for Lens.com that is generated because of Lens.com's purchase of one of the nine Challenged Keywords; becomes confused about whether Lens.com is the same source as, or is affiliated with, 1-800; and therefore clicks on the Lens.com ad to view the site. Lens.com has exploited its use of 1-800's mark to lure the confused consumer to its website. Ordinarily, the likelihood of such luring would need to be estimated by what we can call "informed judgment," which is assisted by analyzing the six *King of the Mountain* factors.

Here, however, we have AdWords data setting an upper limit on how often consumers really were lured in such fashion. A report by Lens.com's expert explained that Lens.com's use of the nine Challenged Keywords yielded 1,626

-25-

impressions for Lens.com or its associated websites over eight months.  In only 25 (1.5%) of these 1,626 instances did the user click on the ad for Lens.com.  (We do not know how many of the 25 made a purchase from Lens.com.)  The users in those 25 instances may have been confused into thinking that Lens.com was affiliated with 1-800, or they may simply have wished to look at the offerings of those whom they knew to be 1-800's competitors.  What we can say, though, is that initial-interest confusion occurred *at most* 1.5% of the time that a Lens.com ad was generated by a Challenged Keyword in those eight months.  This number cannot support an inference that Lens.com's keyword activity was *likely* to "lure[]" consumers away from 1-800.  *Australian Gold*, 436 F.3d at 1238.  It is thus insufficient to justify relief.  *See Universal Money Ctrs.*, 22 F.3d at 1534, 1537 (characterizing a 2.6% confusion rate as de minimis); *cf. CareFirst*, 434 F.3d at 268 (survey reporting a confusion rate of 2% was "hardly a sufficient showing of actual confusion"); *Henri's Food Prods. Co., Inc. v. Kraft, Inc.*, 717 F.2d 352, 358–59 (7th Cir. 1983) (survey reporting a confusion rate of 7.6% weighed *against* a finding of infringement).

Moreover, 1-800's arguments based on other *King of the Mountain* factors does not suggest a contrary conclusion.  It points to the district court's determination that the likelihood of confusion is supported by factors (4) and (5): the parties offer the same services in the same channels of trade (retail sales of replacement contact lenses over the Internet) and "it is unlikely that consumers

exercise a high degree of care in selecting this service." *1-800 Contacts*, 755 F. Supp. 2d at 1177. In addition, it challenges the district court's determination on factor (6) that 1-800's mark is "only moderately strong," *id.* at 1181; and on factor (1), it argues that the relevant marks were identical or nearly identical, because the consumer was using the 1800CONTACTS mark as a search term and Lens.com had triggered the ad by using a nearly identical mark.

This analysis by 1-800 illustrates the danger of applying the factors mechanically without attention to context. The specific issue before us is the likelihood that a consumer who conducts an Internet search for 1-800 Contacts and then sees an ad for Lens.com on the results page will be confused into thinking that Lens.com has a business association with 1-800. To begin with, even if consumers in general may not much care what retailer supplies their contact lenses, the consumers relevant to this suit are looking for a particular retailer. Presumably they have narrowed their search because they have already selected 1-800 as the preferred retailer and are searching for its website or perhaps commentary on its performance. Given the purpose of the search, the shoppers will be attentive to click on those results that will connect them with sites relating to 1-800. In addition, once the consumers see the results page, the substantial dissimilarity between "1-800 Contacts" and "Lens.com" (or its other websites) can be expected to greatly reduce the chance that the consumers will

think that the parties are related enterprises; the similarity of the search term and 1-800's mark is of minor relevance.

Perhaps in the abstract, one who searches for a particular business with a strong mark and sees an entry on the results page will naturally infer that the entry is for that business. But that inference is an unnatural one when the entry is clearly labeled as an advertisement and clearly identifies the source, which has a name quite different from the business being searched for. It is for this reason that the Ninth Circuit considered "the labeling and appearance of the advertisements and the surrounding context on the screen displaying the results page" to be a critical factor in finding no likelihood of confusion in a case in which the alleged infringer used a competitor's mark as a keyword. *Network Automation v. Advance Sys. Concepts*, 638 F.3d 1137, 1154 (9th Cir. 2011). We conclude that the factors other than evidence of actual confusion (even if we assume that 1-800's mark is a strong one) firmly support the unlikelihood of confusion. This case is readily distinguishable from *Australian Gold*, in which the alleged infringer used its competitor's trademarks on its websites. *See* 436 F.3d at 1239.

We now turn to 1-800's arguments regarding actual confusion. First, it cites what it claims to be anecdotal evidence of actual confusion in the marketplace: a customer-service record disclosed by Lens.com reported that a customer called Lens.com in July 2006 to cancel her order, apparently because

she had just realized that Lens.com was not 1-800. Lens.com counters that the customer-service record cannot be probative of the relevant confusion in this case because, among other reasons, it gives no indication how the customer found Lens.com to place her order initially. We agree. It would be speculation to assume that she had clicked on a Lens.com ad after specifically searching for 1-800. Moreover, a single customer-service record is entitled to little weight. *See King of the Mountain*, 185 F.3d at 1092 ("[I]solated instances of actual confusion may be de minimis." (brackets and internal quotation marks omitted)); *Universal Money Ctrs.*, 22 F.3d at 1535–36 (characterizing limited evidence of actual confusion as *de minimis*).

1-800 insists that we must infer that additional, undisclosed customer-service records contained similar evidence of actual confusion because the district court, in sanctioning Lens.com for discovery abuses, forbade Lens.com from characterizing the July 2006 record as *de minimis*. But this argument misreads the district court's order. At the magistrate judge's recommendation, the district court in 2009 ordered that "Lens.com shall be precluded from relying upon any business records of Lens.com or its contractors/subcontractors that were not produced by December 9, 2008," and that "Lens.com shall also be precluded from testifying in a manner that characterizes the contents of such documents." Aplt. App., Vol. 2 at 3463 (Order at 2, *1-800 Contacts*, No. 2:07-cv-591 CW (D. Utah Feb. 27, 2009)). This order simply forbids Lens.com from testifying as to the

meaning of documents that it never produced; it does not require any inference on the court's part as to the meaning of any documents, and it does not relieve 1-800 of its burden of producing evidence of actual confusion. 1-800 still had to bring evidence of actual confusion to the district court's attention. 1-800 cites no such evidence on appeal apart from the lone customer-service record from July 2006.

Next, 1-800 argues that its consumer-confusion survey was wrongly excluded and that it, too, demonstrated actual confusion. Respondents to this survey were recruited through an online questionnaire and were limited to consumers who said that they either had bought contact lenses in the previous 12 months or were considering buying them in the next 12 months. During the survey they were told to imagine that they had just conducted a Google search for "1800contacts," and then they viewed screenshots of search results in which an ad for Lens.com appeared among the sponsored links. After studying the screenshots, they were asked whether they thought that the Lens.com ad either "originate[d] from 1-800-CONTACTS," *id.*, Vol. 12 at 3307, 3315, or "ha[d] sponsorship or approval from 1-800-CONTACTS," *id.* at 3308, 3316. The district court excluded the survey results under Fed. R. Evid. 702 on the ground that methodological flaws undermined the survey's reliability. It focused on two perceived flaws. First, it ruled that the population of respondents was too broad, as it was not limited to prospective *Internet* consumers of contact lenses. Second, it ruled that the questions were ambiguous and leading. The ambiguity arose

-30-

from the first question's failure to clarify whether "1-800-CONTACTS" referred to a search term or a company. And in the court's view the questions were leading because they suggested the possibility of a connection between Lens.com and 1-800 when the respondents might not have considered such a connection on their own. The court found it unnecessary to address Lens.com's arguments concerning other alleged flaws because the survey would have been inadmissible regardless.

"Surveys can be used as evidence of actual confusion, but their evidentiary value depends on the relevance of the questions asked and the technical adequacy of the survey procedures." *Universal Money Ctrs.*, 22 F.3d at 1534 n.3 (internal quotation marks omitted). Although methodological flaws in a confusion survey will typically affect only the survey's weight and not its admissibility, *see Brunswick Corp. v. Spinit Reel Co.*, 832 F.2d 513, 523 (10th Cir. 1987), these flaws may justify exclusion under Rule 702 if they are serious and pervasive enough. *See Vail Assocs.*, 516 F.3d at 864 n.8. We apply abuse-of-discretion review to the manner in which a district court performs its gatekeeping function under Rule 702, recognizing the latitude that it has in determining whether expert testimony is reliable enough to be admitted. *See Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1232 (10th Cir. 2004).

We, too, are concerned about the reliability of the survey. We note only the ambiguity of a key question. Respondents were told that they had entered

"1800contacts" into a Google search and were then asked whether they thought that the ad for Lens.com on the results screen "originates from 1-800-CONTACTS." Aplt. App., Vol. 12 at 3307, 3315. As the district court noted, respondents may have believed that they were being asked whether the ad had resulted from use of the *search term* "1-800-CONTACTS." *See* Aplt. App., Vol. 3 at 5474–75 (Survey Order at 19–20). An affirmative answer based on this belief would not have been at all probative of the likelihood of confusion that 1-800 has alleged. In presenting the survey responses, 1-800's expert lumped together the affirmative responses to the ambiguous question with the affirmative responses to the question whether the respondent believed that the Lens.com ad "ha[d] sponsorship or approval from 1-800-CONTACTS." *Id.*, Vol. 12 at 3308, 3316. As a result, the court had no way of accurately discounting the survey data for any misunderstandings that might have arisen from the ambiguity of the first question's language.

In any event, even assuming that the survey should have been admitted, it does not warrant reversal of summary judgment because it was insufficiently probative of confusion to overcome the factors discussed above. The survey revealed that the relevant confusion was fairly low. To isolate confusion arising specifically from the use of 1-800's mark as a search term and keyword, the survey used a control group; respondents in this group were told to imagine that they had searched for the term *contact lenses* rather than the term *1800contacts*.

-32-

When these control-group respondents were asked whether they thought that the Lens.com ad either originated from 1-800 or had sponsorship or approval from 1-800, 11.9% answered in the affirmative. By comparison, 19.4% of respondents in the first noncontrol group and 19.2% of respondents in the second noncontrol group answered likewise. Subtracting the control group's 11.9% rate of confusion, one is left with net confusion rates of only 7.5% and 7.3% for the two noncontrol groups, or an average net confusion rate of only 7.4%. *See* 6 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 32:187 at 32-432 (4th ed. 2013) (6 McCarthy) (noting use of such corrections to eliminate the "general background noise" of confusion in predicting the likelihood of confusion (internal quotation marks omitted)). The 7.4% figure is at (or below) the lowest confusion rate that, together with other evidence supporting confusion, could justify a conclusion that consumer confusion was likely.

1-800 relies on *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons*, 365 F. Supp. 707, 709 (S.D.N.Y. 1973), in which the plaintiff, a piano maker, sought a declaratory judgment that its trademark Grotrian-Steinweg was not likely to cause confusion with the defendant's trademarks, Steinway and Steinway & Sons. Following a bench trial, the district court found that confusion was likely. *See id.* at 719–20. This finding was based on a welter of evidence in the defendant's favor: The defendants had diligently promoted and continuously used the Steinway name in the United States for many years, making it a strong

-33-

trademark. *See id.* at 712–13. The plaintiffs had "candidly adopted the name Steinweg for the sole purpose of exploiting the Steinweg name in exporting pianos to English-speaking countries . . . despite knowledge of the defendant's trademark and its objections." *Id.* at 714. The parties' marks, as well as their products and the manner in which they marketed them, were closely similar. *See id.* at 714–15. And the defendants submitted one survey that "consisted of a series of 23 tape-recorded personal interviews with recent purchasers of Grotrian-Steinweg pianos," *id.* at 716, many of whom displayed confusion between the two brand names, *see id.* n.33 (reporting "[e]xemplitive responses" that Steinweg was "a Steinway made in Germany," "the Steinway Company in Germany," "the parent company to Steinway," and "the original Steinway, the German Steinway" (internal quotation marks omitted)). Against this backdrop, the district court considered a second survey in which 7.7% of respondents "p[er]ceived a business connection between the two companies and 8.5% confused the names." *Id.* at 716. The court found that the two surveys, taken together, were "strong evidence of the likelihood of confusion which the Lanham Act was designed to prohibit." *Id.* On appeal the Second Circuit ruled only that the district court did not err "in giving weight to the surveys as evidence of actual confusion." *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons*, 523 F.2d 1331, 1341 (2d Cir. 1975).

In contrast, the Seventh Circuit has ruled that a district court was correct to hold that a survey showing a 7.6% confusion rate weighed *against* infringement. *See Henri's*, 717 F.2d at 358–59.[2] The court surveyed relevant cases, including *Grotrian*, and remarked that it had found "no case in which a 7.6% figure constituted likelihood of confusion." *Id.* at 358. It further noted that the district court's opinion in *Grotrian* did not make clear what overlap, if any, existed between the 7.7% of respondents who perceived a business connection between the two piano makers and the 8.5% who confused the names. *See id.* Indeed, a later decision by the Southern District of New York apparently assumed that no such overlap existed, explaining that in *Grotrian* "at least *15 percent* of consumers were confused as to source or endorsement." *Weight Watchers Int'l, Inc. v. Stouffer Corp.*, 744 F. Supp. 1259, 1274 (S.D.N.Y. 1990) (emphasis added). The *Weight Watchers* court assigned little value to a survey that showed a 9.2% rate of confusion. *See id.*

1-800 also cites *Goya Foods, Inc. v. Condal Distributors, Inc.*, 732 F. Supp. 453, 457 n.7 (S.D.N.Y. 1990), for the proposition that any rate of confusion

_____

[2] 1-800 argues that *Henri's* supports its claim because no correction for net confusion had been made in that case. It suggests that the figure in this case that should be compared to the 7.6% in *Henri's* is the overall confusion rate of more than 19% before subtracting the control-group confusion rate of 11.9%. But there was no control group in *Henri's*, so one can only speculate about what would have been the control-group rate of confusion (the "'general background noise,'" 6 McCarthy § 32:187 at 32-432). Hence, we read *Henri's* as standing for the proposition that even if the actual confusion rate was as high as 7.6%, that would not support a finding of a likelihood of confusion.

greater than 7% is meaningful. In that case the plaintiff, Goya, contended that the packaging of the defendant's "Condal" five- and ten-pound bags of rice imitated the packaging of Goya's "Canilla" rice. *See id.* at 453. The court found confusion, based on the strength of the Canilla mark, the similarity in the packaging, the close competitive proximity of the products, the lack of sophistication of rice consumers, and three surveys. *See id.* at 454–58. The court dismissed one survey as not designed to measure the relevant confusion. *See id.* at 456. A second survey reported that when respondents were shown a package of Condal rice, 44.9% said that the first company or brand that came to mind was Goya or Canilla; and of those, 27.5% said that the packaging caused them to say that and 20.5% said that the Condal and Canilla packages were very similar or identical. *See id.* In the third survey, respondents were handed an empty Condal bag and were asked what brand it was; 9% identified the bag as Canilla or Goya. *See id.* Goya's expert said that "any figure greater than 7 percent *in this sort of study* is meaningful and represents a real confusion." *Id.* at 457 (emphasis added) (internal quotation marks omitted). The court said that the expert's statement was supported by case law, citing only *Grotrian*. *See id.* n.7.

We are not persuaded that *Grotrian* and *Goya* support the proposition that surveys showing confusion as low as 7% can by themselves sustain a finding of likelihood of confusion. Both cases seem rightly decided, but primarily because of the strength of other factors supporting confusion and other persuasive survey

-36-

results.  The strongest statement that can be made based on those opinions is that "surveys *without obvious defects* indicating confusion of seven percent to 15 percent of the sample have been held adequate, *when supported by other evidence*, to prove a likelihood of confusion."  Restatement (Third) of Unfair Competition § 20 cmt. g. at 216–17 (1995) (emphases added); *cf. id.* at 217 ("The weight to be accorded a specific survey depends on the facts and circumstances of each case.  The fact that a particular percentage is held sufficient to establish infringement in one case thus does not necessarily indicate that it is sufficient to establish infringement in other cases.").  The great weight of authority appears to be that "[w]hen the percentage results of a confusion survey dip below 10%, they can become evidence which will indicate that confusion is *not* likely." 6 McCarthy § 32:189 at 32-440 (emphasis added).

Thus, 1-800's survey is entitled to no more than minimal weight.  And that minimal weight cannot sustain a finding of likelihood of confusion in the circumstances presented here.  The other factors, including the hard data noted above, overwhelmingly indicate the unlikelihood of confusion.  Even if the survey was admissible evidence, summary judgment for Lens.com was required.

**B.      Secondary Liability for Ads Placed by Lens.com Affiliates**

1-800 claims that Lens.com should have been denied summary judgment on the claims of secondary liability for infringement allegedly committed by affiliates who published ads on its behalf.  1-800's arguments focus exclusively

-37-

on the conduct of two affiliates, Goggans and McCoy. Both Goggans and McCoy purchased keywords that were either identical or closely similar to 1-800's service mark. In addition, McCoy published at least one ad for www.JustLenses.com that featured a close variation of the mark in its text.

Again, 1-800's theories of secondary liability are vicarious liability and contributory infringement. Vicarious liability arises when common-law principles of agency impose liability on the defendant for the infringing acts of its agent. *See Procter & Gamble*, 317 F.3d at 1127–28. Contributory infringement occurs when the defendant either (1) intentionally induces a third party to infringe on the plaintiff's mark or (2) enables a third party to infringe on the mark while knowing or having reason to know that the third party is infringing, yet failing to take reasonable remedial measures. *See Inwood*, 456 U.S. at 853–54; *Procter & Gamble*, 317 F.3d at 1128 ("An action for contributory liability is not limited to a manufacturer, but may also extend to licensors, franchisers, or to similarly situated third parties."); *Coach, Inc. v. Goodfellow*, No. 12-5666, 2013 WL 2364091, at *6 (6th Cir. May 31, 2013) (defendant was liable for contributory infringement "because he knew or had reason to know of the infringing activities and yet continued to facilitate those activities . . . without undertaking a reasonable investigation or taking other appropriate remedial measures"). Vicarious and contributory liability must be predicated on some *direct* infringement by the third party. *See* 4 McCarthy § 25:17 ("By definition, there

can be no liability for contributory infringement unless there is direct infringement."); *cf. La Resolana Architects, PA v. Reno, Inc.*, 555 F.3d 1171, 1181 (10th Cir. 2009) ("[B]oth contributory and vicarious infringements require someone to have directly infringed the copyright."). Lens.com therefore cannot incur secondary liability unless one of the affiliates in question directly violated the Lanham Act.

As noted, the low ratio of clicks to impressions associated with Lens.com's own keyword use and the other *King of the Mountain* factors convince us that summary judgment was appropriate on 1-800's direct-infringement claim. The same factors and similar data convince us that insofar as Goggans and McCoy used keywords that resulted in ads for Lens.com entities that did not display 1-800's mark in their text, no genuine factual issue exists regarding likelihood of confusion. As for hard data, the record reveals that McCoy's use of "1800Contacts" or some variation thereof as a keyword generated more than 448,000 impressions whose text did not display the mark. Of these impressions, at most 3,163—or about .7%—resulted in clicks. Likewise, one of 1-800's own exhibits revealed that Goggans's use of "1800Contacts" as a keyword generated 242,864 impressions for www.JustLenses.com that did not display the mark in their text, and only 1,445 of the impressions—also fewer than 1%—resulted in clicks. 1-800 does not dispute these numbers, which are even more in Lens.com's favor than the 1.5% clicks-to-impressions rate for 1-800's direct-liability claim.

Thus, to the extent that 1-800's secondary-liability claim derives from keyword use by Goggans and McCoy that did not generate ads containing the 1800CONTACTS mark, there is insufficient evidence of direct infringement. And absent any evidence of direct infringement, Lens.com cannot be secondarily liable. The district court properly granted summary judgment to Lens.com on this keyword use.

1-800's only remaining claim is that Lens.com is secondarily liable for McCoy's publication of ads that featured variations of the 1-800 mark in their text. We examine vicarious and contributory infringement on this claim.

### 1. Vicarious Liability.

The district court granted summary judgment to Lens.com on 1-800's vicarious-liability theory, ruling that the evidence would not support a reasonable inference that the affiliates were Lens.com's agents. *See 1-800 Contacts*, 755 F. Supp. 2d at 1182–84. We have some concerns with the district court's analysis and Lens.com's arguments that there was no agency relationship. First, one need not show a fiduciary relationship to establish that an agency relationship exists; rather, fiduciary duties arise as a result of circumstances establishing the agency relationship. *See* Restatement (Third) of Agency § 1.01 cmt. e. at 23 (2006) ("To establish that a relationship is one of agency, it is not necessary to prove its fiduciary character as an element."). Second, that certain affiliates may have worked for another advertiser at the same time that they were working for

-40-

Lens.com does not necessarily mean that they could not have been agents of Lens.com. An agent can serve multiple principals at once, even principals that are competing with one another. *See, e.g.*, *Sonnenschein v. Douglas Elliman–Gibbons & Ives*, 713 N.Y.S.2d 9, 12 (N.Y. App. Div. 2000) ("It has long been the common-law rule that a real estate broker can represent more than one seller or lessor at a time, and can show multiple properties to the same buyer, without breaching its fiduciary duty."); *Foley v. Mathias*, 233 N.W. 106, 107 (Iowa 1930) ("The situation in this case is analogous to that which arises when a real estate agent has listed with him a number of houses for rent and a lease to one of them is made to the customer of the real estate agent. Every owner of the houses is a rival of every other owner for the lease with the real estate agent's customer, but can it be said that, because the real estate agent has several houses listed with him, therefore, the real estate agent cannot recover his commission for leasing one of them to one of his customers without the intelligent consent of both? Manifestly not."); Restatement (Third) of Agency § 3:14 cmt. b.; *cf. NLRB v. Town & Country Elec., Inc.*, 516 U.S. 85, 94–95 (1995) (worker can be servant of union and employee of company at same time). Third, the absence or infrequency of direct communication from Lens.com to its affiliates is not conclusive on whether the affiliates were its agents. A principal can authorize its agent to appoint a subagent, and the subagent can then act as an agent for the principal even though the principal's control is indirect. *See* Restatement (Third)

of Agency § 3.15 ("Subagency"). Fourth, an independent contractor can be an agent. An agent need not be an employee. *See Bradbury v. Phillips Petroleum Co.*, 815 F.2d 1356, 1360 (10th Cir. 1987) ("[T]he terms 'agents' and 'independent contractor' are not necessarily mutually exclusive."); *Appleby v. Kewanee Oil Co.*, 279 F.2d 334, 336 (10th Cir. 1960) ("[A] broker is but a species of agent who may also be an independent contractor."); *cf. Proctor & Gamble Co. v. Haugen*, 222 F.3d 1262, 1278 (10th Cir. 2000) (noting that distributors were "more analogous to independent contractors than to employees under Utah law," but then considering whether they were agents). And fifth, one can be an agent of a principal without having authority to bind the principal to a contract with a third party. *See* Restatement (Third) of Agency § 1.01 cmt. c. at 19 ("Agents who lack authority to bind their principals to contracts nevertheless often have authority to negotiate or to transmit or receive information on their behalf.").

We need not resolve, however, whether the evidence was sufficient to establish an agency relationship between Lens.com and its affiliates. Assuming without deciding that the affiliates were agents of Lens.com, we note that a principal is subject to liability for its agent's tortious conduct only if the conduct "is within the scope of the agent's actual authority or ratified by the principal." *Id.* § 7.04. 1-800 does not contend that Lens.com ratified McCoy's allegedly infringing ad. And although Lens.com argues broadly that its affiliates "ha[d] no authority, apparent or actual, to act on behalf of Lens.com," Aplee. Br. at 39, we

can affirm summary judgment without going so far. The issue is not whether McCoy had authority to act on Lens.com's behalf *at all*, but merely whether he had actual authority to publish an ad displaying a variation of 1-800's mark in its text. An agent acts with actual authority if it "reasonably believes, in accordance with the principal's manifestactions to the agent, that the principal wishes the agent so to act." Restatement (Third) of Agency § 2.01. As the Restatement further explains,

> Lack of actual authority is established by showing either that the agent *did not believe*, or could not reasonably have believed, that the principal's grant of actual authority encompassed the act in question. This standard requires that the agent's belief be reasonable, an objective standard, *and that the agent actually hold the belief, a subjective standard*.

*Id.* § 2.02 cmt. e (emphases added). The subjective component of actual authority is determinative here.

The record contains undisputed evidence that McCoy did not hold the belief that Lens.com authorized him to publish ads displaying 1-800's mark in their text. McCoy did not place any such ads himself. Rather, the ads were composed and published by one of his employees without his knowledge. Asked during a deposition whether he would agree that placing the phrase "1-800 Contacts" in the text of an ad for www.JustLenses.com "probably isn't proper," McCoy replied, "Yes, I would." Aplt. App., Vol. 6 at 1116. Pressed further on whether he would have "stopped that practice" if he had known about it sooner, McCoy responded,

-43-

"Absolutely." *Id.* The unavoidable inference is that McCoy *never* believed, reasonably or otherwise, that Lens.com authorized him to place the ads. Thus, the subjective component of actual authority was absent. We affirm summary judgment on the vicarious-liability claim on this ground. *See United States v. Cesareo–Ayala*, 576 F.3d 1120, 1128 n.2 (10th Cir. 2009) (noting that "we can affirm a judgment on any ground established by the record, so long as doing so is not unfair to the appellant," and explaining that we saw "no unfairness" in affirming on a particular ground when the facts were undisputed and the issue was clear).

### 2. Contributory Infringement.

#### a. Sufficiency of the Evidence.

The district court granted summary judgment on contributory infringement solely on the ground that the principles of contributory liability did not allow McCoy's offending ads—the ones featuring 1-800's mark in their text—to be imputed to Lens.com. *See 1-800 Contacts*, 755 F. Supp. 2d at 1184–87. Accordingly, we focus only on those principles without deciding whether the ads themselves directly infringed 1-800's mark.

We agree with the district court that the record cannot support a reasonable inference that Lens.com intentionally induced its affiliates to place the mark in the text of their ads. As to the second *Inwood* alternative, however, we must reverse summary judgment. In our view, a rational juror could find that Lens.com

knew that at least one of its affiliates was using 1-800's service mark in its ads yet did not make reasonable efforts to halt the affiliate's practice. True, the record contains no evidence that before 1-800 filed its complaint on August 13, 2007, Lens.com either knew or had reason to know that any affiliates were using 1-800's mark in their ad copy. But the complaint alleged that an ad for www.JustLenses.com had displayed the 1800CONTACTS mark in its text, and it copied a screenshot of the ad. And Lens.com did not take corrective action until three months later, on November 14, when it apparently asked CJ to contact McCoy with instructions to remove the offending ads.

Lens.com argues that during these three months it was communicating with CJ in an effort to identify the culpable affiliate and that absent such identification it did not have the actual or constructive knowledge that *Inwood* demands. It points out that 1-800's complaint did not reveal which of the more than 10,000 affiliates in Lens.com's network had published the ad displaying 1-800's mark. But Lens.com does not dispute 1-800's assertion that "Lens.com had an effective tool to stop its affiliates' infringement—by merely communicating to them that they may not use 1-800's mark . . . in the language of sponsored links. Where Lens.com has instituted such prohibitions in the past, affiliates ceased their infringing conduct." Aplt. Br. at 62–63. The record reflects that Lens.com could communicate with all its affiliates at one time through an email blast from CJ or a monthly newsletter sent by CJ to every Lens.com affiliate. Thus, Lens.com may

well not have needed to identify the offending affiliate to halt the placement of 1-800's mark in affiliate ad copy.

We can readily distinguish the two cases that Lens.com cites to support its contention that it had no duty to act until it knew the specific offender. In both cases knowledge of the specific offender was necessary for the defendant to take effective action. One case concerned Google's policies permitting advertisers to use trademarks as keywords and, to a limited extent, to feature them in the text of advertisements themselves. *See Rosetta Stone*, 676 F.3d at 151–52. Rosetta Stone sued Google for contributory infringement because the policies enabled sellers of counterfeit Rosetta Stone software to mislead consumers by placing ads that appeared when consumers conducted searches for "Rosetta Stone." *See id.* at 151–52, 163. The circuit court referred to the district court's finding that "there is little Google can do beyond expressly prohibiting advertisements for counterfeit goods, taking down those advertisements when it learns of their existence, and creating a team dedicated to fighting advertisements for counterfeit goods." *Id.* at 164 (brackets and internal quotation marks omitted). In this context, it made sense for the court to write:

> It is not enough to have general knowledge that some percentage of the purchasers of a product or service is using it to engage in infringing activities; rather, the defendant must supply its product or service to *identified individuals* that it knows or has reason to know are engaging in trademark infringement.

*Id.* at 163 (emphasis added) (internal quotation marks omitted).

-46-

The second case, *Tiffany (NJ) Inc. v. eBay, Inc.*, 600 F.3d 93, 103 (2d Cir. 2010), reviewed a suit by Tiffany against the online auction service eBay, in which Tiffany alleged that eBay had contributorially infringed on the Tiffany trademark by allowing third parties to list counterfeit Tiffany goods for sale on its website. The circuit court noted the significant efforts made by eBay to prevent sales of counterfeit Tiffany goods,[3] pointing out that when "complaints gave eBay reason to know that certain sellers had been selling counterfeits, those sellers' listings were removed and repeat offenders were suspended from the eBay site." *Id.* at 109. Nevertheless, Tiffany argued that eBay was a contributory infringer because it "continued to supply its services to the sellers of counterfeit Tiffany goods while knowing or having reason to know that such sellers were infringing Tiffany's mark." *Id.* at 106. The court rejected the argument. It wrote: "For contributory trademark infringement liability to lie, a service provider must have more than a general knowledge or reason to know that its service is being used to sell counterfeit goods. Some contemporary knowledge of which particular listings are infringing or will infringe in the future is necessary." *Id.* at 107.

---

[3] For example, the district court found that eBay had invested up to $20 million each year to combat fraud; that it had implemented a complex computer program that automatically searched for counterfeit listings; that it maintained a policy of deleting a counterfeit listing within 24 hours of receiving a complaint from a trademark holder, and in fact deleted most such listings within 12 hours; that it suspended from its site each year tens of thousands of vendors suspected of infringing conduct; and that it had implemented a system allowing trademark holders like the plaintiff to review any suspicious listings before they became public. *See Tiffany (NJ) Inc. v. eBay, Inc.*, 600 F.3d 93, 98–100 (2d Cir. 2010).

As we read the opinions in *Rosetta Stone* and *Tiffany*, they support rather than contradict 1-800's theory of liability here.  Both defendants, Google and eBay, had established means by which a third party could engage in trademark infringement—by letting third parties advertise counterfeit products.  The discussion in both opinions implicitly assumed that once the defendant knew of an identified third party's infringing ads, it would be a contributory infringer if it did not halt the ads.  But the plaintiff did not describe any way for the defendant to stop an unidentified infringer without also interfering with legitimate advertising (as by, say, halting all use of "Rosetta Stone" as a keyword or all ads for Tiffany products).  A defendant has no obligation under contributory-infringement doctrine to stop a practice—such as accepting ads for Tiffany products—simply because the practice might be exploited by infringers.  *Cf. Inwood*, 456 U.S. at 854 n.13 (contributory liability cannot be imposed merely for the defendant's failure to "reasonably anticipate" infringement by third parties (internal quotation marks omitted)).  The obvious rationale for ordinarily requiring that the defendant know the identity of the infringer is that otherwise the defendant could not halt the infringement without also stopping perfectly proper conduct—throwing the baby out with the bath water, so to speak.  But what if, as argued in the case before us, the defendant need not know the identity of the infringer to stop the allegedly infringing practice without affecting legitimate conduct?  We do not infer from *Rosetta Stone* and *Tiffany* that either court would have required

-48-

knowledge of the particular offender to impose contributory liability in such a situation.

In our view, if Lens.com could have stopped the use of ads using 1-800's mark by simply requiring CJ to send an email blast to its affiliates forbidding such use, then Lens.com's failure to proceed in that manner after learning of such ads could constitute contributory infringement. Lens.com does not dispute that once it learned that one of its affiliates had used 1-800's mark in the content of an ad, it had an obligation to conduct an investigation to determine which affiliate was the publisher and then order that affiliate to halt the practice. *See Coach, Inc.*, 2013 WL 2364091, at \*6 (when flea market operator had been informed that vendors were selling counterfeit goods, he was "properly held liable for contributory trademark infringement because he knew or had reason to know of the infringing activities and yet continued to facilitate those activities by providing space and storage units to vendors without undertaking a reasonable investigation or taking other appropriate remedial measures"). Why then can it not be held liable for failing to take the far easier step of ordering an email blast that would necessarily reach the publisher and stop the publication, and would not interfere with any lawful conduct of other affiliates? When modern technology enables one to communicate easily and effectively with an infringer without knowing the infringer's specific identity, there is no reason for a rigid line

requiring knowledge of that identity, so long as the remedy does not interfere with lawful conduct.

We take comfort in the 90-year-old Supreme Court opinion in *William R. Warner & Co. v. Eli Lilly & Co.*, 265 U.S. 526 (1924). The Court stated that injunctive relief against the manufacturer of the product Quin-Coco, which some druggists had misrepresented as the plaintiff's Coco-Quinine product, *see id.* at 529–30, should include a requirement that the labels on the products sold to druggists "state affirmatively that the preparation is not to be sold or dispensed as Coco-Quinine or be used in filling prescriptions or orders calling for the latter," *id.* at 533; *see Inwood*, 456 U.S. at 861 n.2 (White, J., concurring) (noting that *Warner*, although predating the Lanham Act, is authoritative in interpreting the Act). The notice requirement in *Warner*, whose content was essentially the same as that of the suggested email blast to Lens.com affiliates, apparently does not violate any foundations of trademark law (although, of course, an injunction directed at a wrongdoer can order behavior beyond that required by the common-law cause of action or statute alone).

In sum, a reasonable jury could find that during the period between the filing of 1-800's complaint and Lens.com's corrective action, Lens.com knew that at least one of its affiliates was publishing an ad bearing 1-800's mark, yet it did not take reasonable action to promptly halt the practice. We conclude that 1-800 has presented enough evidence to support a claim of contributory infringement.

### b. Unclean Hands

We next must turn to an argument raised by Lens.com to counter all of 1-800's infringement claims, direct or indirect. Lens.com argues that even if it would otherwise be liable for infringement, 1-800's claim is barred by 1-800's unclean hands. It contends that 1-800 has done precisely what it accuses Lens.com of doing—bidding on keywords similar to the marks of its competitors, including Lens.com, only with much greater financial reward. Such alleged misconduct by 1-800, however, is irrelevant to the claim against Lens.com. In a prior infringement case we noted that the doctrine of unclean hands "does not empower a court of equity to deny relief for any and all inequitable conduct on the part of the plaintiff." *Worthington v. Anderson*, 386 F.3d 1314, 1320 (10th Cir. 2004). Rather, a plaintiff's unclean hands will bar recovery for trademark infringement only if the inequitable conduct is "related to the plaintiff's cause of action." *Id.* We said that courts have found such a relationship in two situations: First, there is such a relationship when the plaintiff has engaged in inequitable conduct toward the public, such as "deception in or misuse of the trademark itself, resulting in harm to the public such that it would be wrong for a court of equity to reward the plaintiff's conduct by granting relief." *Id.*; *see Clinton E. Worden & Co. v. Cal. Fig Syrup Co.*, 187 U.S. 516 (1903) (refusing to grant relief to owner of "'Syrup of Figs'" trademark when trademark itself misrepresented product as containing fig juice). Second, the plaintiff's misconduct is sufficiently related to

-51-

the cause of action "when the plaintiff has acted inequitably toward the defendant *in relation to the trademark*." *Worthington*, 386 F.3d at 1320 (emphasis added); *see id.* at 1321 (applying unclean-hands doctrine to affirm denial of plaintiffs' infringement claim because plaintiffs "threw economic obstacles in the way of [defendants'] compliance with the arbitrator's decision awarding the trademark to [plaintiffs]"). Lens.com does not claim that the first situation is present here. As for the second, Lens.com improperly refers to conduct relating to trademarks other than the one that it allegedly infringed. As one authority explains:

> The plaintiff's alleged infringement of a different trademark does not furnish grounds for an unclean hands defense. For example, if A sues B for infringement of A's trademark ALPHA, can B deflect the lawsuit by claiming that A has unclean hands, alleging that A is infringing B's trademark BETA? The answer is that this is *not* unclean hands because A's alleged infringement of the trademark BETA is not relevant to the subject matter of the litigation concerning B's alleged infringement of the trademark ALPHA. The plaintiff's alleged infringement of another's mark is actually a form of the defense of *jus tertii*, which is uniformly rejected by the courts.

6 McCarthy § 31:48 at 31-131 to 132 (footnotes omitted). Lens.com's unclean-hands defense fits this description perfectly. It is unavailing.

## C. Lens.com's Cross-Appeal

Lens.com cross-appeals the district court's award to 1-800 of its attorney fees in pursuing a successful motion to compel discovery. The motion to compel concerned 1-800's request that Lens.com produce records of all its keyword purchases through AdWords along with records of all its affiliates' keyword

purchases. The magistrate judge ordered production and recommended sanctions. Lens.com filed objections with the district court, but produced the records before the district judge heard the appeal. The district judge upheld the magistrate judge's decision and imposed sanctions. Lens.com does not argue on cross-appeal that it was prejudiced in any way by the disclosure; the sole harm that it claims is the sanction.

"We review discovery sanctions for abuse of discretion." *Klein–Becker USA, LLC v. Englert*, 711 F.3d 1153, 1159 (10th Cir. 2013). Under this standard, "a trial court's decision will not be disturbed unless the appellate court has a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *Lorillard Tobacco Co. v. Engida*, 611 F.3d 1209, 1213 (10th Cir. 2010) (internal quotation marks omitted).

Lens.com argues that 1-800's discovery request was overbroad, particularly because its choice of keywords was a trade secret (even though there was a protective order in place to limit those with access to trade secrets).[4] But this

_____

[4] Lens.com also argues that rather than having to disclose the entire list of its keyword purchases and those of its affiliates, it should have been allowed to submit the relevant documents to the magistrate judge for an inspection in camera. That suggestion is certainly reasonable, but Lens.com does not indicate that it made such a suggestion in the district court, and we have not found it in the record. Indeed, the district judge noted that Lens.com had never "come to the court to ask for some relief from producing so much." Aplee. Supp. App., Vol. 1 at 149. Lens.com has forfeited its right to argue about the magistrate judge's

(continued...)

argument misses the point. The district judge expressed sympathy with Lens.com's complaint about the breadth of the discovery request. The basis for the sanctions was Lens.com's dilatory and obstructive responses to the request. By the time of the hearing before the district judge, the records had been disclosed, and the judge knew that some of the produced records were indisputably relevant. He expressed particular concern that Lens.com had not produced *any* records earlier. In the circumstances, we see no abuse of discretion in imposing the sanction. We decline, however, to grant 1-800's request for further sanctions based on its belief that Lens.com's appeal on this issue was frivolous.

## D.    Lens.com's Attorney-Fees Appeal

After the district court granted summary judgment, Lens.com moved for attorney fees under the Lanham Act, *see* 15 U.S.C. § 1117(a), and under a Utah statute, *see* Utah Code Ann. § 78B–5–825. The court denied the motion. Lens.com appeals on both the Lanham Act issue and the Utah statutory issue. We affirm for substantially the reasons set forth in the district court's thorough and cogent order. We can add nothing useful to its discussion. Our partial reversal of the summary judgment awarded to Lens.com only provides further support for the

---

[4](...continued)
failure to conduct an in camera review. *See Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 632 (10th Cir. 2012) ("Litigants who do not raise a claim or argument before the district court cannot do so on appeal.")

denial of attorney fees. 1-800's motion for leave to present new information is moot. Also, we deny 1-800's request for attorney fees in responding to what it incorrectly describes as Lens.com's frivolous appeal on this issue.

## III. CONCLUSION

We AFFIRM summary judgment on all claims of infringement based on keyword use that did not result in ads displaying 1-800's mark in their text. With respect to the secondary-liability claims related to ads that did display the mark in their text, we AFFIRM summary judgment on vicarious infringement but REVERSE and REMAND on contributory infringement. We AFFIRM the district court's sanctions order challenged by Lens.com's cross-appeal and the court's decisions not to award further attorney fees to 1-800 or to Lens.com. The sealed portions of the appendices will be unsealed 20 days from the filing of this opinion unless one of the parties files a motion, under seal if necessary, "setting forth precisely what information should be kept confidential and why lesser measures (such as submission of a redacted [appendix]) would not provide effective protection." *Therrien v. Target Corp.*, 617 F.3d 1242, 1259 (10th Cir. 2010).